IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                              Criminal No.:  ELH-16-499

DAMION JORDAN,

Defendant.

**MEMORANDUM OPINION**

Damion Jordan entered a plea of guilty in October 2017 to one count of Hobbs Act Robbery.  ECF 56.[1]  In December 2017, he was sentenced to 156 months of imprisonment.  ECF 72.  He is currently serving his sentence at Hazelton USP.  ECF 100 at 5.

Jordan, who is now self-represented,[2] has filed a motion for compassionate release (ECF 95, the "Motion"), supported by exhibits.  ECF 95-1.  He has also filed a supplement to the Motion, which includes a request for home confinement.  ECF 98.  The government opposes the Motion (ECF 100, the "Opposition"), supported by several exhibits.  ECF 101-1 to ECF 101-4.  Jordan has not replied and the time to do so has passed.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

**I.  Background**

A Criminal Complaint was filed against Jordan and a codefendant, Miles Guest, on October 3, 2016.  ECF 1. Jordan and the codefendant were indicted on October 13, 2016.  ECF 12.  Initially,

---

[1] This case was originally assigned to Judge J. Frederick Motz. It was reassigned to me on October 17, 2017.

[2] The Office of the Federal Public Defender advised the Court that it would not supplement Jordan's pro se filing. ECF 97.

Jordan was charged with one count of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a) (Count One), and one count of using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Two).  *Id*.  However, in a Superseding Indictment filed on September 7, 2017 (ECF 39), Jordan was charged in 23 counts. These included one count of conspiracy to commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a); eleven counts of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a); and eleven counts of using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  *Id*.

Pursuant to a Plea Agreement (ECF 57), Jordan entered a plea of guilty on October 31, 2017, to Count One of the original indictment.  ECF 56.  That count charged Hobbs Act Robbery of a GameStop store on January 13, 2016.  In accordance with Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties agreed to a total sentence of 156 months' imprisonment. ECF 57, ¶ 9.

The Plea Agreement contemplated a combined offense level of 31, based on the stipulated facts.  Those facts established that between December 1, 2015 and January 13, 2016, Jordan committed both the robbery referenced in Count One and seven additional armed robberies.  ECF 57, ¶ 6; *id*. at 9-10.  There was no agreement as to defendant's criminal history.  *Id*. ¶ 7.

According to the factual stipulation, defendant and another person robbed a 7-Eleven convenience store located in Catonsville, Maryland on December 1, 2015.  *Id*. at 9.[3]  The pair

---

[3] The factual summary did not name the other individual. However, on September 11, 2017, Guest entered a plea of guilty to the Hobbs Act Robbery of the GameStop store on January 13, 2016. *See* ECF 42; ECF 43. The parties agreed that the facts established that Guest committed five of the seven additional robberies discussed here. ECF 43 at 4.

entered the store, brandished a firearm, and ordered the store clerk to lay on the floor.  *Id*.[4]  They then stole "numerous packs of Newport cigarettes and money from the store's cash register."  *Id*.

Jordan next robbed a GameStop store located in Halethorpe, Maryland on December 21, 2015.  *Id*.  Defendant and another person entered the store, brandished a firearm, and demanded all the money in the cash register.  *Id*.  They also ordered all store employees and customers into the back room, where they demanded everyone's cell phones.  *Id*.  Defendant and the other person stole six video game systems and over $2,000 in cash.  *Id*.

The third robbery was of a GameStop video game store located in Baltimore on December 29, 2015.  *Id*.  Jordan and another person entered the store, "pointed a firearm at employees and customers and forced them into the rear of the store."  *Id*.  They demanded cell phones from all occupants, removed video game systems from the shelves, and left the store.  *Id*.

On January 2, 2016, defendant and another person robbed the GameStop store located in Laurel, Maryland.  *Id*.  Defendant and another person brandished a firearm and demanded money from the store employees.  *Id*.  Customers and employees were forced to stand against the wall and turn over their phones and keys.  *Id*.  Defendant and the other individual then took money from the cash register and "assorted merchandise" before leaving.  *Id*.

The fifth and sixth robberies both occurred on January 4, 2016, and were also of two GameStop video game stores.  *Id*. at 9-10.  At about 7:31 p.m., Jordan and another person entered the store in Glen Burnie, Maryland, pointed a firearm at customers and employees, and demanded money from the employees.  *Id*. at 9.  They took personal items from several employees and

---

[4] With the exception of the robbery on January 13, 2016, the stipulation does not specify who wielded the firearm during the various robberies.

"forced them into a room in the rear of the store."  *Id*.  They then stole cash from the register and approximately seven video game systems.  *Id*.

At about 8:52 p.m. the same night, defendant and another person robbed a GameStop store in Windsor Mill, Maryland.  *Id*.  The assailants pointed a firearm at store employees and demanded money.  *Id.* at 9-10.  One of the assailants "grabbed two customers and took them to a back room." *Id*. at 10.  The other individual asked store employees to open the cash registers and they then took the money.  *Id*.  The two robbers then forced two employees to the back room, where they stole cell phones from both employees and customers.  *Id*.  They also stole approximately four video game systems.  *Id*.

The seventh robbery occurred on January 11, 2016, at the same 7-Eleven store in Catonsville that defendant had robbed on December 1, 2015.  *Id*.  Defendant and another person pointed a firearm at store employees and demanded money.  *Id*.  They then stole money from the register, along with numerous packs of Newport cigarettes.  *Id*.

The eighth and final robbery was of a GameStop video game store in Catonsville on January 13, 2016, which was the same store that is the subject of Count One.  *Id*. at 4, 10.  After entering the store with another individual, Jordan pointed a revolver at a store employee and demanded "all of the money in the register," while the second individual demanded video games. *Id*. at 10.  The two individuals then instructed the employee and a customer to go to the back of the store, at which point they took seven video game systems and left.  *Id*.

After the two left, the store employee called 911.  *Id*.  A responding police officer noticed a vehicle speeding away from the GameStop store and gave chase.  *Id*.  This vehicle, which contained Jordan and the other suspect, "suddenly and recklessly evaded the officer, sped away, ran a stop sign, and nearly collided with several motorist [sic] and pedestrians during flight."  *Id*.

4

Eventually, the vehicle crashed near a Baltimore County Police station, at which point defendant and the other person fled on foot. *Id.* Thereafter, police apprehended them. *Id.*

After obtaining a search warrant, police searched the vehicle, recovering video game systems and other materials matching those taken from the GameStop store. *Id.* In addition, "Police recovered a revolver resembling that used in every previous robbery as well as an additional handgun." *Id.*

Sentencing was held on December 15, 2017. ECF 72. At that time, Jordan was 25 years old. *See* ECF 68 (Presentence Report or "PSR") at 3. The PSR reflected a combined adjusted offense level of 31. *Id.* ¶¶ 27-78. After deductions for acceptance of responsibility, the defendant had a final offense level of 28. *Id.* ¶¶ 80-82.

The PSR also reflected several prior criminal convictions in Maryland state courts. *Id.*¶¶ 87-89. This yielded a criminal history score of five and a criminal history category of III. *Id.* ¶ 89. In particular, Jordan pled guilty in the Circuit Court for Baltimore County in 2010 to possession with intent to distribute heroin and assault in the second degree. He was initially sentenced to four years of incarceration with three years suspended. *Id.* ¶ 87. After Jordan violated probation, he received a sentence of three years. *Id.* In 2012, Jordan pled guilty in the Circuit Court for Baltimore City to possession of a firearm after a felony conviction. *Id.* ¶ 88. He received a sentence of 2 months and 14 days. *Id.*

The advisory sentencing guidelines called for a period of incarceration ranging from 97 to 121 months. *Id.* ¶ 116. Under Rule 11(c)(1)(C) of the Plea Agreement, the parties agreed to a sentence of 156 months of imprisonment.

Defendant is 5'11" tall and, at sentencing, he weighed 170 pounds. *Id.* ¶ 104. The PSR noted that Jordan's father struggled with heroin addiction and was not present for parts of defendant's childhood. *Id.* ¶¶ 100, 103. But, his mother consistently played a supportive role. *Id.*

Jordan used marijuana from age 15 until 2013, and also has a history of using illegally obtained prescription drugs. *Id.* ¶ 108. He obtained his GED, and in 2015 he attended Baltimore City Community College. *Id.* ¶ 110.

Jordan reported that he used an inhaler for asthma, "as needed." *Id.* ¶ 105. His allergies and asthma were described as most severe during the change in seasons, "and when he is physically exerted and when he is feeling stressed." *Id.* According to Jordan's mother, Jordan's asthma is "chronic and severe." *Id.* ¶ 106.

As noted, I imposed a total sentence of 156 months' imprisonment, with credit for time served since January 16, 2016, as well as three years of supervised release. ECF 73 at 2, 3. I also recommended Jordan's participation in a substance abuse program, including the Residential Drug Abuse Program at the Bureau of Prisons ("BOP"). *Id.*

In paragraph 11 of the Plea Agreement (ECF 57), the defendant waived many of his rights to appeal. Nevertheless, defendant noted an appeal to the Fourth Circuit. ECF 76. In a brief filed pursuant to *Anders v. California*, 386 U.S. 738 (1967), counsel for Jordan stated there were no meritorious grounds for appeal. ECF 91-1 at 2. In a per curiam decision, the Fourth Circuit affirmed the conviction and sentence, but remanded for entry of a written statement of reasons. ECF 91-1; *see United States v. Jordan*, 807 F. App'x 201 (4th Cir. 2020).[5]

---

[5] Curiously, the Court docket reflects that the Statement of Reasons had been filed on December 15, 2017. *See* ECF 74. That is the same date that the Judgment was entered. *See* ECF 73.

Jordan was previously incarcerated at FCI Schuylkill, but has been transferred to Hazelton USP.  ECF 100 at 5 n.1.  The BOP indicates a projected release date for Jordan of May 2027.  ECF 100-2 at 3; *see also Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Oct. 26, 2021).  Given the credit Jordan received for his time in custody since January 2016, Jordan has served about 69 months of his 156-month sentence, or approximately 44%.

Notably, the record reflects a series of disciplinary infractions incurred by Jordan while incarcerated, stretching from 2018 to January 15, 2021.  ECF 100-4.  These include disruptive conduct; threatening bodily harm; possessing an unauthorized item; communicating gang affiliation; violating visiting regulations; and fighting with another person.  *Id*.

As the government notes (ECF 100 at 20-22), and as Jordan's medical records reflect (ECF 100-1), in April 2021 Jordan declined an opportunity to receive the Pfizer COVID-19 vaccine.  No explanation or context for this refusal appears in the record.

Jordan represents that if he is released, he will reside at his mother's house in Baltimore. ECF 95 at 4.  He states that his family will provide him with all "essentials needed for healthy living," as well as rehabilitation.  ECF 98.

Jordan filed an administrative request for compassionate release on April 13, 2020, which was denied by the Warden on April 20, 2020.  ECF 95-1 at 1.  Jordan filed an administrative appeal on April 27, 2020 (*id*. at 2), which was rejected the next day.  *Id*. at 4-5.  The government does not contest that Jordan has exhausted his administrative remedies.  *See* ECF 100 at 18.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395

(4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the Bureau of Prisons ("BOP"). *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress enacted the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days

from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  In U.S.S.G. § 1B1.13, the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  It is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." *See McCoy,* 981 F.3d at 276-77. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy,*

981 F.3d at 276. But, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

In resolving a compassionate release motion, a court must also consider the factors in 18 U.S.C. § 3553(a). *See Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (Mem.) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). And, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229,

230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

However, as indicated, § 1B1.13 was last updated in November 2018, before the enactment of the First Step Act.  It is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283.  Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id*. at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 827.  But, compassionate release is a "rare" remedy.  *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151,

2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[6]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[7]  Defendant filed his motion for compassionate release in July 2020.  ECF 95.  At that time, the nation was "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and

---

[6] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

schools were shuttered or operated on a limited basis.  This is because the virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of November 9, 2021, COVID-19 has infected more than 46 million Americans and caused approximately 757,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Nov. 9, 2021).

Although this country saw a reduction of cases in prior months, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants").

But, in recent weeks, the trend has again become more favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."); *see also* Jon

Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").  Even so, health authorities warn that there remain reasons for caution, including the relatively low levels of vaccination in some parts of the country, as well as the encroachment of colder weather and the impending holiday season, which will lead to an increase in the number of indoor gatherings, where the virus can more easily spread.  *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  Most recently in October 2021, it again updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 14, 2021), https://bit.ly/38S4NfY.  According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease,

cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; and substance use disorders. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.

Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented

substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[8]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No.

---

[8] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since expanded considerably, and the vaccine was recently approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021,  https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 68% of all persons twelve years of age and older are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Nov. 9, 2021).  And, 58% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of November 9, 2021, the BOP had 133,782 federal inmates and 36,000 staff.  And, by that date, the BOP had administered 245,279 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 9, 2021).

As of November 9, 2021, the BOP reported that 173 out of a total 133,782 federal inmates and 281 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 42,571 inmates and 8,322 staff have recovered from the virus; and 266 inmates and seven staff members have died from the virus.  Moreover, the BOP has completed 125,106 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Hazelton USP, where the defendant is imprisoned, the BOP reported that as of November 9, 2021, out of a total of 1,351 inmates, zero have tested positive, zero have died of COVID-19, and 83 inmates and 196 staff have recovered at the facility. In addition, 458 staff members and 2,516 inmates at the Hazelton complex have been inoculated with the vaccine.  *See*

https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/haz/ (last visited Nov. 9, 2021).

## IV. Discussion

Jordan has moved for compassionate release on the basis of his underlying medical conditions of "chronic breathing disorder," asthma, seasonal allergies, and a diagnosis as prediabetic. ECF 95 at 2. He states that medical examinations indicate that he has "inflammation in the nasal passage and mucosal thickening in the right nasal inferior turbinates," and that per a physician at FCI Schuylkill, if he were to contract COVID-19 in prison, he would "suffer severe complications that would be detrimental to [his] continued survival." *Id*. at 2-3; *see also* ECF 95-1 at 10. He argues that these medical conditions render him "uniquely vulnerable" to serious illness if he contracts COVID-19, particularly in a prison environment, and that these conditions thus constitute an extraordinary and compelling reason for relief. ECF 95 at 1-4.

The government argues that Jordan has failed to demonstrate an extraordinary and compelling reason on the basis of these conditions, which it contends do not rise to the level required to make defendant uniquely vulnerable to COVID-19. ECF 100 at 18-20. Furthermore, it notes that Jordan has refused the COVID-19 vaccine, and asserts that this substantially weakens his case for finding extraordinary and compelling reasons. *Id*. at 20-22. Finally, it argues that the sentencing factors in 18 U.S.C. § 3553(a) support a denial of relief, given the seriousness of defendant's offense, his criminal history, his disciplinary record while incarcerated, and the length of his remaining sentence. *Id*. at 23-28.

Jordan's asserted underlying health conditions seem, at best, a borderline case for finding extraordinary and compelling reasons. The CDC is clear that diabetes itself can make someone more likely to get seriously ill from COVID-19. But, it does not make the same assertion as to

prediabetes.  *People with Certain Medical Conditions, supra*; *see also Frequently Asked Questions: COVID-19 and Diabetes*, AM. DIABETES ASS'N, https://www.diabetes.org/coronavirus-covid-19/how-coronavirus-impacts-people-with-diabetes (last visited Oct. 26, 2021).

With regard to asthma, the CDC is clear that people with "moderate-to-severe or uncontrolled asthma are more likely to be hospitalized from COVID-19." *People with Moderate to Severe Asthma*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html  (last updated Apr. 7, 2021).  But, it is unclear, based on the record, if Jordan's asthma qualifies as "moderate to severe."  And, Jordan's other asserted medical conditions are not identified by the CDC as the kind that increase one's chances of getting severely ill due to COVID-19.

As for defendant's asthma, he is prescribed Albuterol and Mometasone to control his condition.  ECF 95 at 2; ECF 100 at 18; ECF 100-3 at 1-6, 14-17, 30-31.  In his Motion, Jordan states that he is "taking his Albuterol inhaler four times per day."  ECF 95 at 2.  His medical records seem to indicate, however, that while he has been prescribed Albuterol to use up to four times a day, as needed, to prevent and relieve asthma attacks, he is not to use it daily.  ECF 100-3 at 5, 15.  And, defendant stated during a clinical visit in March 2021 that "he only uses his Albuterol sparingly."  *Id*. at 3.

A number of courts have found that prediabetes is not sufficient to constitute an extraordinary and compelling reason in the context of COVID-19.  *See, e.g.*, *United States v. Manning*, 5 F.4th 803, 807 (7th Cir. 2021) (noting prediabetes is not recognized by the CDC as increasing risk); *United States v. Evans*, CCB-18-234, 2021 WL 3725421, at *1 (D. Md. Aug. 23, 2021) (same); *United States v. Freeman*, No. 13-CR-50071, 2021 WL 843456, at *1 (N.D. Ill.

Mar. 5, 2021) (same); *United States v. Mungarro*, No. 07-20076, 2020 WL 6557972, at *2-3 (E.D. Mich. Nov. 9, 2020) (noting roughly one in three Americans are prediabetic); *United States v. Hall*, JKB-04-323, 2020 WL 4582712, at *2 (D. Md. Aug. 10, 2020).

Rulings as to asthma are mixed.  Judge Grimm has noted: "This Court and others have found that the standard of extraordinary and compelling reasons was met during the COVID-19 pandemic where a defendant had a risk of serious complications from COVID-19 based on asthma and other medical conditions. . . . However, in some cases this Court and others have found that mild asthma alone did not a [sic] constitute extraordinary and compelling reasons for release." *United States v. Jennings*, PWG-13-046, 2020 WL 4748462, at *4 (D. Md. Aug. 17, 2020) (collecting cases).

Similarly, another Court has remarked: "Because the CDC lists moderate to severe asthma as a condition that can increase the risk of severe illness caused by COVID-19, many courts have distinguished between petitioners with mild/moderate asthma to severe asthma when deciding whether the condition constitutes a compelling and extraordinary circumstance justifying compassionate release. . . . Moderate asthma occurs 'where the individual suffers from daily symptoms, experiences nighttime awakenings more than once a week, uses an Albuterol rescue inhaler on a daily basis, and experiences some limitation of normal activities.'" *United States v. Garcia*, ___ F. Supp. 3d ___, 2021 WL 1890290, at *2 (D. Mass. May 11, 2021) (internal citations omitted).  *See also, e.g.*, *United States v. Armstrong*, RDB-19-357, 2021 WL 2806226, at *3 (D. Md. July 6, 2021) (citing CDC guidance, declining to find extraordinary and compelling reasons based on asthma adequately managed by prescriptions); *United States v. Malone*, CCB-13-307, 2021 WL 252559, at *1 (D. Md. Jan. 26, 2021) (asthma alone not sufficient grounds for compassionate release); *United States v. Daniels*, Crim. No. 15-127, 2020 WL 4674125, at *3

(E.D. Pa. Aug. 12, 2020) (recognizing that moderate to severe asthma could constitute an extraordinary and compelling reason for compassionate release, but concluding it was not warranted based on medical records indicating asthma is under control defendant was instructed to use Albuterol only to prevent attack, but not daily).

Jordan's asthma would seem to fall into the more mild category, as described in the cases, which would not support a finding of extraordinary and compassionate release.  In any event, as the government notes (ECF 100 at 20-22), and as Jordan's medical records reflect (ECF 100-1), in April 2021 Jordan declined an opportunity to receive the Pfizer COVID-19 vaccine.  No explanation or context for this refusal appears in the record.  And, Jordan had the opportunity to reply to the government's Opposition, filed in May 2021, in which it raised this issue.  But, he has not done so.  *See* Docket.

Jordan's decision to refuse the vaccine substantially weakens his argument for compassionate release.  The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic."  *Key Things to Know about COVID-19 Vaccines*,  Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated Aug. 16, 2021).

Given this context, I have previously joined a growing number of district court judges across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.  As Judge Gallagher has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from

COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release. . . .  Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months."  *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

Thus, even if Jordan's underlying medical conditions were sufficient, his refusal to be vaccinated leads me to conclude that Jordan's medical condition does not constitute an extraordinary and compelling circumstance under 18 U.S.C. § 3582.

Even assuming, *arguendo*, that Jordan has demonstrated extraordinary and compelling medical circumstances for compassionate release, the factors the Court must consider at the next step would weigh against compassionate release.  The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  When a court finds extraordinary and compelling reasons under 18 U.S.C.

§ 3582(c)(1)(A), it must still consider the factors set forth in 18 U.S.C. § 3553(a) in deciding whether to exercise its discretion in favor of release.  *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

Jordan was convicted of an extremely serious armed robbery offense, as described.  As part of his plea, Jordan also admitted to the commission of a total of *eight* different armed robberies over a two-month period, which involved threatening numerous store employees and customers, at gunpoint.  *See* ECF 57 at 4, 9-10.  This spree ended with a police chase that put innocent bystanders in danger.  *Id.* at 10.  Although the eight robberies never resulted in death or injury to others, the threat from having a firearm was an inherent part of Jordan's tactics.  Such conduct was in complete disregard to the safety of others.  The severity of the offenses weighs heavily against any grant of compassionate release.

In addition, Jordan has assembled a record of disciplinary infractions while incarcerated, with two serious charges (threatening bodily harm and disruptive conduct) just this year.  *See* ECF 100-4 at 1-3.  Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see United States v. Lancaster*, 997 F.3d 171, 175 (4th Cir. 2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986

F.3d 402 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 F. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 F. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).  Finally, as noted *supra*, Jordan has completed less than half of his 156-month sentence.

I do not find that Jordan has established any extraordinary and compelling reason for sentencing reduction.  Even if he had, the relevant factors would not justify granting the Motion.

Finally, as mentioned, Jordan's supplemental submission (ECF 98) contains what appears to be a request for home confinement.  But, any request for the conversion of a sentence of imprisonment to a sentence of home confinement must be submitted to the BOP, and not to this Court.

Section 3624(c) of Title 18 of the United States Code is the only statute that authorizes the transfer of an inmate from prison to home confinement. That section specifically provides that "[t]he authority under this subsection may be used to place a prisoner in home confinement for the shorter of ten percent of the term of imprisonment of that prisoner or six months." 18 U.S.C. § 3624(c)(2). However, this authority resides with the BOP, and not with the courts.

Although § 12003(b)(2) of the CARES Act states that, during the COVID-19 emergency, "the director of the Bureau [of Prisons] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement," this provision does not alter the exclusive authority of the BOP to make this determination. *See United States v. Baker*, No. l:10-

cr-69-MR-1, 2020 WL 2430945, at *1 (W.D.N.C. May 12, 2020) (stating that authority to grant such relief rests solely with the Director of the Bureau of Prisons); *United States v. Gray*, No. 4:12-CR-54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (finding "defendant must seek home confinement through the BOP's administrative system"); *United States v. Johnson*, Crim. No. JKB-14-0356, 2020 WL 1929459, at *2 (Apr. 21, 2020) ("It is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c).").

Therefore, this Court does not have the authority to place the defendant in home confinement. This request must be made through the BOP's administrative system.

### V.  Conclusion

For the reasons set forth above, I shall deny the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: November 12, 2021                                    /s/
                                              Ellen L. Hollander
                                              United States District Judge

27